COMMONWEALTH *vs.* JOSE RODRIGUEZ.

Norfolk.    November 13, 1978. — December 22, 1978.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Practice, Criminal,* Instructions to jury, View. *Identification. Evidence,* Relevancy and materiality, Photograph.

Where a defendant charged with assault and battery with a dangerous weapon and forcible rape maintained throughout the trial that the victim was honestly mistaken in her identification of him but did not dispute the facts and details of the assault and rape, the judge erred in failing to instruct the jury as to the possibility of mistaken identification and in placing undue emphasis on the credibility of the defendant. [740–744]

INDICTMENTS found and returned in the Superior Court on January 6, 1977.

The cases were tried before *Irwin,* J.

*Eric D. Blumenson* for the defendant.

*Charles J. Hely,* Assistant District Attorney (*Sydney Hanlon,* Assistant District Attorney, with him) for the Commonwealth.

GRANT, J. The defendant has appealed from convictions on separate indictments charging him with rape and with assault and battery by means of a dangerous weapon. His ensuing commitment as a sexually danger-

ous person has already been reviewed by the Supreme Judicial Court on a contingent basis. *Commonwealth* v. *Rodriguez*, 376 Mass. 632, 647 , n.20 (1978). We review the convictions, confining our consideration to those assignments of error which have been argued (Rule 1 : 13 of the Appeals Court, as amended, 3 Mass. App. Ct. 801 [1975]), which have merit, and which are directed to questions which seem likely to arise upon the retrial which we hold is required. *Commonwealth* v. *Dutney*, 4 Mass. App. Ct. 363, 364 (1976). *Commonwealth* v. *Coburn*, 5 Mass. App. Ct. 781, 782 (1977). The retrial is required by what we perceive as prejudicial error in a portion of the charge.

Both assaults occurred in a residential area of Brookline some time shortly after 11:15 P.M. on an overcast September night. The victim became aware that a man had been following her for several minutes as she walked in the direction of the single-family dwelling in which she lived, but at that time she could only make out the general build and hair style of the man and the type of jacket he was wearing. The man spoke to the victim, who turned to face him as he stood approximately ten feet away with a broken bottle in his hand in an area which was roughly equidistant from two street lights which were spaced approximately half a block apart. Some additional measure of illumination (how much is problematical) was shed on the area by a nearby porch light and by lights in nearby houses. The man took approximately three steps in the victim's direction, grabbed her, turned her around, placed the bottle to her neck (cutting her under her chin), dragged her into a nearby back yard, threw her to the ground, knelt over her, covered her head with his jacket, and raped her. The ground was wet from previous rain. It was only during the few seconds after the victim turned to face the man and during his final approach that she had an opportunity to observe the man's facial features, hair and eyeglasses; once he had turned her around he kept her effectively blinded, either by placing his fingers on her eyes or his jacket over her head.

The victim ran to her home as soon as the man departed, and the police were summoned. The victim gave the police a description of the color and shade of the man's skin, together with descriptions of his build, approximate height, hair style, moustache, glasses and jacket. She referred to him as "possibly Hispanic." Working on that information, the police attempted to obtain a photographic identification of the man in question, with a somewhat indecisive result; the most the victim could do was point to a photograph of the defendant as resembling the man who had assaulted and raped her. A second attempt to secure a photographic identification from the same array of photographs on the following morning yielded the same result. (On that occasion the victim may have said that the photograph of the defendant "most resembled" the man.) The victim's first positive identification of the defendant as her assailant occurred approximately a month later, when the victim got a momentary glimpse of the defendant as he entered the court house on the morning of the probable cause hearing. She made positive identifications of the defendant at that hearing and at trial.

It should be explained at this point that the facts and details of the assaults were undisputed; the principal thrust of the defense was that the victim had been and still was mistaken in identifying the defendant and that her mistakes had been and were the products of impermissibly suggestive procedures employed by the police.[1] At no time during the course of the trial did the defendant ever suggest that the victim was lying or biased, either consciously or unconsciously.

The physical and circumstantial evidence pointing to the defendant was not overwhelming. The prosecution offered in evidence a pair of jeans and a jacket fitting the general description given by the victim which the police

---

[1] We deal with various aspects of the latter contention in Appendix B hereof.

had found while searching the defendant's room on the morning following the assaults. When found, the knees of the jeans were wet and muddy. A police chemist testified that the soil found on the jeans was consistent with a sample of soil taken from the back yard where the victim had been raped, but it was common ground that the type of soil found on the jeans was consistent with what could be found in a great many lawns and other areas throughout the country. The police chemist found blood stains on the jacket but could not identify them as to blood type; an expert called by the defendant testified that he had been able to identify two distinct blood types on the jacket, one of which matched the type found on the neckband of the T-shirt which the victim had been wearing at the time of the assaults as well as the defendant's blood type; this expert berated the police for not conducting other tests which he thought should have been performed in the circumstances. The police chemist testified that the color of certain hairs found in the crotch of the underpants worn by the defendant when he was arrested on the morning following the assaults was consistent with the color of a sample of pubic hair which had been obtained from the victim and inconsistent with the color of a sample of the defendant's pubic hair; an expert called by the defendant testified that the numbers of hairs involved in all the samples were insufficient to permit valid color comparisons. No seminal stains were found in the underpants.

The defendant took the stand and testified to an alibi, which was corroborated in part by his father. He also testified to what the jury could have found were innocent explanations of the conditions found on the knees of his jeans and of the two types of blood found on his jacket; those explanations were corroborated in part by his father and in part by an acquaintance who was called as a witness. The defendant also testified that he had never seen the victim prior to the date of the probable cause hearing. He was cross examined at some length.

It was with the evidence in this general posture that the defendant requested instructions to the effect that in determining whether the Commonwealth had met its burden of proving the defendant guilty beyond a reasonable doubt, the jury should consider the possibility that the victim might have been mistaken in identifying the defendant as her assailant and that in that connection they could consider the victim's opportunity to observe her assailant, the length of her observation and the circumstances in which it had been made, the time lapse between the assaults and the date of the probable cause hearing, and the possibility that the victim's memory might have become faulty with the passage of time. A major portion of the defendant's closing argument was devoted to the proposition that the victim had been mistaken and to the factors of witness perception and memory which the defendant had referred to in his requests for instructions. None of the requested instructions was given, either as phrased or in substance. The only instructions which were given on evaluating the testimony of witnesses are set out in Appendix A to this opinion.[2] The defendant's objections and exceptions to the instructions and refusals to instruct were timely and explicit.

There is nothing improper in a judge's pointing out factors to be considered by the jury in weighing the credibility of oral testimony so long as he does so fairly, gives the jury no indication of whom he believes, and clearly places the function of ultimate appraisal of the testimony on the jury. *Commonwealth* v. *Christie*, 145 Mass. 232, 233-234 (1887). *Barrette* v. *Hight*, 353 Mass. 268, 268-271 (1967). A.B.A. Standards, Trial by Jury § 4.7(b)(iv) (Approved Draft 1968). What the judge may not do is "invade the province of the jury by undertaking to decide on the weight or effect of evidence, or by refusing to submit to their consideration any question of fact, material to the

---

[2] The numbers in brackets in the appendix have been inserted by us for ease of reference in the body of the opinion; the italics are ours.

issue which may be in dispute." *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 370 (1977), and case cited. See also *Commonwealth* v. *Ingersoll*, 145 Mass. 231, 231-232 (1887); *Commonwealth* v. *Sneed*, 376 Mass. 867, 869-870 (1978); *Commonwealth* v. *Perry*, 3 Mass. App. Ct. 308, 311 (1975). These principles assume particular importance whenever there is a question of possible mistaken identity and the defendant takes the stand to testify to an alibi or asserts an alibi through other witnesses called in his behalf. *Commonwealth* v. *Flynn*, 165 Mass. 153, 156-157 (1896). *Commonwealth* v. *Borges*, 2 Mass. App. Ct. 869 (1974). See also *Commonwealth* v. *DiRoma*, 5 Mass. App. Ct. 853, 854 (1977).

It should be noted that the challenged instructions (Appendix A) were prefaced by the question "how do we decide who[m] we believe?" ([1]). That question was followed by references to "bias or prejudice," to "[appearance] . . . when he talked to us" and to the "stake . . . he may have in the outcome of the case" ([2]) as "*the* tests that you use" (emphasis supplied) ([3]). The above was followed by an additional reference to "the stake that person has in what he is telling you or in the outcome of what he is telling you" as one of the "considerations . . . taken into account" ([4]). That underlying theme was reiterated when the judge, near the conclusion of his remarks, referred to a witness's "stake . . . in the outcome of this trial," to his appearance of "telling us the truth," to his responsiveness "to one side [more] than . . . the other" and to whether he was "evasive" as "types of considerations" which would help the jury in "determining what you believe and what you don't believe" and as "*the* way . . . you will eventually reach the truth in this case" (emphasis supplied) ([5 ).

Those instructions placed great emphasis on the purely objective factors by which the jury should determine the veracity of witnesses in general. We think that when they are evaluated in light of the complete absence of any instruction on the possibility that the victim might have

been honestly mistaken in her identification of the defendant or on the factors of witness perception and memory which had been referred to in the defendant's requests, the instructions tended to submerge one of the crucial issues in the case. See *Commonwealth* v. *Cote*, 5 Mass. App. Ct. at 370. We also think the instructions unwittingly placed undue emphasis on the testimony of the defendant. It is true that the judge referred to witnesses in the feminine as well as the masculine gender ([2]) and that he urged the jury to apply his "considerations" to all the witnesses "one by one" ([5]), but it was only the defendant who had a real "stake" in the outcome of the trial ([2]), [4] and [5]). Having in mind that the defendant had never suggested that the victim had lied, we think the jury could have considered that the word "evasive" ([5]) was also directed to the defendant. Taking those words together and in context, and considering them in light of (a) all the evidence which has been summarized above and (b) the absence of any instruction on the possibility of a mistaken identification, we think the jury could well have concluded that their principal task would be to determine the credibility of the defendant. We need not consider whether the jury could also have concluded that the judge believed the victim had told the truth (see *Commonwealth* v. *Barry*, 9 Allen 276, 277-279 [1864]; *Commonwealth* v. *Foran*, 110 Mass. 179, 180 [1872]); it is enough that we conclude that the "impression left with the jury by the [instructions] as a whole" (*Commonwealth* v. *Ramey*, 368 Mass. 109, 114 [1975]; *Commonwealth* v. *Ware*, 5 Mass. App. Ct. 506, 509 [1977], · *S.C.* 375 Mass. 118 [1978]) was erroneous and that the defendant should have a new trial on both indictments.

The defendant's motions to suppress and questions which seem likely to arise at another trial are treated in Appendix B hereof.

The judgments are reversed, and the verdicts are set aside.

*So ordered.*

# Appendix A

[1] "So you say to me, 'Well, *how do we decide who we believe?'* And I say to you that, in approaching that responsibility, what you have to bring with you is the wider variety of experience that you have had in your every day life. And again you say to me, 'Well, really, Judge, that is not very satisfactory. How do we go ahead and decide who we believe?'

[2] "How do you decide whether or not you believe me? How do you decide that? *First of all, you say, 'What reason does he have to be telling us this? What bias or prejudice does he have? What do we know about him? How did he appear to us when he talked to us? What stake does he or she have in the outcome of this case?'*

[3] "*Those are the tests that you use.* Because, quite frankly, when you come to your jury service, the greatest asset that you can bring with you to your jury duty, beyond your integrity, and that goes without saying, is your common sense. You people have lived a variety of lives, experienced all sorts of things during the course of your life, made all sorts of judgments that you are going to be compelled to make in the course of the trial, judgments as to who you believe.

[4] "If you stop and think, you make that judgment every day of your lives; every day somebody tells you something, whether in your business, your home or wherever, and you are making that rapid, calculated and distinctive [?] judgment whether you believe what is being told to you. If you stop to think of it and you stop to analyze it a little bit, the way you're making those judgments, based upon the way I just told you, *you are examining the source of it, you are examining the way that it's put to you, you're examining the stake that person has in what he is telling you or in the outcome of what he is telling you. All of those considerations are taken into account.*

[5] "*So if you want my suggestions,* when you deliberate this case, *take these witnesses and take them one by one and say to yourselves, 'How did that witness strike me? What stake did that witness have in the outcome of this trial? Did the witness appear to be telling us the truth? Was the witness more responsive to one side than to the other? Did the witness look away from us? Was the witness evasive?' All of those types of considerations help you in determining what you believe and what you don't believe. And that is the way you will eventually reach the truth in this case,* or any other criminal case. Because when you strip it, take out all of the rhetoric, the word, 'verdict,' is really from two Latin words, 'veritas' and 'dico,' which means, 'to speak the truth.' And I can't think of twelve people who are more responsible in terms of being able to reach the truth in a given case than the twelve of you who will deliberate this case."

## APPENDIX B

B-1. So much of the motion to suppress items of physical evidence as was directed to the articles of clothing worn by the defendant at the time of his arrest has now been abandoned. The defendant has not abandoned the portion of the same motion which was directed to the articles of clothing seized in his room which were not specifically named on the face of the search warrant. None of those items was offered in evidence at the pretrial hearing on the motion, nor was there any testimony describing the items which had been seized. The judge made no meaningful finding of fact on any of the questions raised by this portion of the motion, and a review of the transcript of the hearing and of the judge's findings suggests a measure of confusion as to the respective burdens of proof on those questions. See *Commonwealth* v. *Wojcik*, 358 Mass. 623, 625-626, 626-628, 631 (1971); *Commonwealth* v. *Murray*, 359 Mass. 541, 546-547, 548-549 (1971); *Commonwealth* v. *Bond*, 375 Mass. 201, 206, 210 (1978); *Commonwealth* v. *Fields*, 2 Mass. App. Ct. 679, 680, 681-682 (1974). In the circumstances the interests of justice will be best served by affording the defendant a complete new pretrial hearing on this portion of his motion. See Rule 61 of the Superior Court (1974). Compare *Commonwealth* v. *Wojcik*, 358 Mass. at 632; *Commonwealth* v. *Daniels*, 366 Mass. 601, 607-609 (1975); *Commonwealth* v. *Colella*, 2 Mass. App. Ct. 706, 707-708 (1974).

B-2. The defendant was not unduly restricted by any of the rulings excluding questions which he attempted to put to various witnesses during the course of the pretrial hearing on the motion to suppress the victim's prior photographic identifications of the defendant (if they were that) and her proposed in-court identification of the defendant. As neither that motion nor either of its supporting affidavits raised any question as to the admissibility of the victim's in-court identification of the defendant at the probable cause hearing, the question as to what some member of the prosecution team might have said to the defendant's then counsel in advance of that hearing concerning a prior positive identification of the defendant by the victim was properly excluded as irrelevant. The judge had before him all the mugshots which had ever been shown to the victim; questions as to the differing physical features of the various persons depicted in the mugshots were matters for argument rather than oral testimony. (As the judge remarked, "The photographs are exhibits, are they not?") Other questions were properly excluded as too broad or as not directed to the issue of whether any of the victim's identifications of the defendant had been or would be the product of improper suggestions made by the police. See and compare *Commonwealth* v. *Gordon*, ante 230, 238, 240-241 (1978). There is nothing to the contrary in *Commonwealth* v. *Dickerson*, 372 Mass. 783, 788-789 (1977).

B-3. The evidence at the hearing on the same motion was insufficient to warrant a finding that the police had employed any impermissibly suggestive procedure in the course of showing the victim an array of mugshots on the night of the assaults. Compare *Commonwealth* v. *Coburn*, 5 Mass. App. Ct. 781, 782 (1977), and cases cited. When considered in light of the description of her assailant which the

victim had given the police within minutes of the assaults, there was nothing about that array (which is now before us) which casts any doubt on the judge's finding that "[t]he photographic display was in no way suggestive" or which required him to exclude evidence concerning either of the victim's viewings of the array. See *Commonwealth* v. *Mobley*, 369 Mass. 892, 894-895, 896-897 (1976); *Commonwealth* v. *Jones*, 375 Mass. 349, 352–355 (1978). Contrast *Commonwealth* v. *Gordon, supra* at 239.

B-4. The judge did not err in refusing to suppress evidence concerning the second display of the mugshots to the victim, which took place on the morning following the assaults. There was evidence from which it could have been found that the first attempt to elicit a photographic identification of the assailant, which had been made the previous night by an officer on cruiser patrol who had been summoned to the victim's home within minutes of the assaults, had not resulted in a positive identification by the victim; that the second display was conducted by the detective who was to head up the investigation and who was reluctant to rely solely on hearsay knowledge gained from a fellow officer; that the victim informed the detective, in advance of the second display, that she was then more certain of her assailant's features than she had been the previous night because she had had time to think about what had happened; that there was nothing impermissible about the manner in which the second display was conducted; and that that display also failed to yield a positive identification. On that evidence it was open to the judge to find and rule (as he impliedly did) that there was nothing about the second display which required that it be suppressed. *United States* v. *Eatherton*, 519 F.2d 603, 605-609 (1st Cir.), cert. denied, 423 U.S. 987 (1975). See also *Commonwealth* v. *Ross*, 361 Mass. 665, 669, 673 (1972), vacated on other grounds, 410 U.S. 901, aff'd on rehearing, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973).

B-5. A like ruling was warranted with respect to the additional mugshots of the defendant, taken when he was considerably younger, which the detective also showed the victim on the same morning (but which were not offered in evidence or referred to at trial); the unshaken testimony of the victim was "[t]he only thing that was similar to the assailant is that they had the same wire rim glasses" as those which she had described to the police the previous night but which did not appear in any of the mugshots she had already viewed. See *Commonwealth* v. *Gordon, supra* at 233.

B-6. The evidence at the pretrial hearing fully warranted the judge's finding that the prosecution had not arranged the momentary glimpse of the defendant which the victim got as the defendant entered the court house on the morning of the probable cause hearing. Contrast *Commonwealth* v. *Botelho*, 369 Mass. 860, 862-863 (1976). Neither of the persons accompanying the defendant on that occasion was in uniform, and it did not appear that the victim saw (or even could have seen) the handcuffs which the defendant may have been wearing at the time. Compare *Commonwealth* v. *Farmer*, 5 Mass. App. Ct. 871, 872 (1977). Contrast *Commonwealth* v. *MacMillan*, 5 Mass. App. Ct.

314, 317-318 (1977). The only evidence was that it was the victim who, without any prompting on the part of the prosecution, volunteered that she had just seen her assailant as he had passed by the window of the room in which she was sitting while awaiting the hearing. There was no error in the judge's finding that "this view [was] not in any way suggestive" or in his refusal to suppress evidence thereof. Compare *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 262-263 (1970); *Commonwealth* v. *Denault,* 362 Mass. 564, 565-567 (1972); *Commonwealth* v. *Walker,* 370 Mass. 548, 563-565, cert. denied, 429 U.S. 943 (1976).

B-7. In view of the conclusions reached in (3) through (6) above, there is no need to examine the judge's findings and ruling concerning the admissibility of the victim's proposed in-court identification of the defendant at trial. *Commonwealth* v. *Mobley,* 369 Mass. at 897. *Commonwealth* v. *Barnett,* 371 Mass. 87, 91 (1976), cert. denied, 429 U.S. 1049 (1977). *Commonwealth* v. *Chase,* 372 Mass. 736, 745-746 (1977). *Commonwealth* v. *Funderberg,* 374 Mass. 577, 582 (1978).

B-8. The defendant could not require separation of the front and profile views of the mugshots before they were shown to the jury (see *Commonwealth* v. *Kelly,* 1 Mass. App. Ct. 441, 446 [1973]), but he was entitled to have them sanitized in the other respects requested. *Commonwealth* v. *Gerald,* 356 Mass. 386, 387-388 (1969). *Commonwealth* v. *Cobb,* 374 Mass. 514, 522–523 (1978). *Commonwealth* v. *McCants,* 3 Mass. App. Ct. 596, 598 (1975). He was not entitled to an instruction (if such was the fact) that he had been acquitted of the offence which had been charged when his mugshots had been taken. *Commonwealth* v. *Shagoury,* ante 584, 595.

B-9. There was nothing in either of the judge's refusals to allow the defendant to call the court reporter to testify at trial to any prior inconsistent statements the victim might have made during the pretrial hearing on the motions to suppress which precluded the defendant from introducing such statements before the jury. The defendant's counsel had with him at the counsel table, during both the pretrial hearing and the trial, a law student qualified under S.J.C. Rule 3 : 11(1), as amended, 367 Mass. 914 (1975), who took notes of the testimony and who would have been competent to testify to any prior inconsistent statement which the victim might have made during the pretrial hearing. We note that during his cross examination of Detective Murphy the defendant appears to have secured the benefit of the only allegedly prior inconsistent statement he wanted to prove, together with Murphy's testimony to the effect that that statement appeared on the back of Exhibit 4D.

B-10. The judge did not err in excluding the litany of questions to the police witnesses as to whether they had followed certain procedures or performed certain tests which had not been referred to by them in the course of their respective direct examinations. When the questions were asked and excluded there was nothing, apart from the argumentative nature of the questions themselves, to suggest that the police had conducted an unfair or sloppy investigation. See and contrast *Commonwealth* v. *Pettie,* 363 Mass. 836, 838-839, 840-841 (1973).

There was nothing in any of the judge's rulings on those questions which, when considered in context, deprived the defendant of his right to relitigate before the jury the question whether any of the victim's identifications of the defendant might have been prompted by improperly suggestive action on the part of the police. See *Commonwealth* v. *Jones* , 375 Mass. at 535 ; *Commonwealth* v. *Moynihan*, 376 Mass. 468, 476-477 (1978).

B-11. Nor did the judge err in allowing the prosecutor to ask one of the defendant's experts whether he had in this case performed some of the various scientific tests which he had described at length; the answers were material to the weight which should be given to the witness's testimony.

B-12. No abuse of discretion is disclosed by the judge's refusals to allow two of the defendant's experts to testify to their visual observations of the experiments concerning lighting conditions at and in the vicinity of the point where the victim had had her first opportunity to observe the facial features of her assailant. There was uncontradicted testimony to the effect that there had been no change in the location or lumens of either of the street lights described by the victim, and it might have been inferred from other evidence that there had been no change in the amount of light shed by the nearby porch light which she had mentioned, but the defendant was admittedly unable to lay any foundation as to similarity of conditions with respect to the "lights in the houses" which had been referred to by the victim as contributing to her ability to observe her assailant. See *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 592-593 (1956); *Commonwealth* v. *Geagan*, 339 Mass. 487, 511, cert. denied, 361 U.S. 895 (1959) ("The evidence could have been excluded on the ground that the traffic, weather, and light conditions were not shown to be sufficiently similar"); *Commonwealth* v. *Flynn*, 362 Mass. 455, 473 (1972).

B-13. Like considerations dictate the conclusion that there was no error in the denial of the defendant's motion that the jury be taken on a view "shortly after dark." The judge could well have thought that a view at such a time would be valueless or even misleading in assessing the lighting conditions at the time of the assaults. See *Commonwealth* v. *Lamoureux*, 348 Mass. 390, 391-392 (1965); *Commonwealth* v. *Curry*, 368 Mass. 195, 198 (1975); *Commonwealth* v. *Washburn*, 5 Mass. App. Ct. 195, 198 (1977). Contrast *Commonwealth* v. *Dominico*, 1 Mass. App. Ct. 693, 708-709 (1974).