COMMONWEALTH vs. SHON S. SIMMONS.

Suffolk. November 14, 1980. — January 12, 1981.

Present: BROWN, GREANEY, & DREBEN, JJ.

*Identification. Practice, Criminal,* Instructions to jury.

At a criminal trial in which the major issue raised by the defendant was the question of a possible mistaken identification, the judge's instructions to the jury with respect to identification testimony, in which he repeatedly emphasized the Commonwealth's burden of proving identity beyond a reasonable doubt and instructed that "testimony as to identity must be received with caution and scrutinized with care," were sufficient even though he omitted from the charge certain specific guidelines for evaluation of identification testimony. [160-164]

INDICTMENTS found and returned in the Superior Court on September 23, 1976.

The cases were tried before *Sullivan, J.*

*William P. Homans, Jr. (Sandra G. Forman* with him) for the defendant.

*M. Catherine Huddleson,* Legal Assistant to the District Attorney (*Kevin Connelly,* Assistant District Attorney, with her) for the Commonwealth.

GREANEY, J. In January, 1977, the defendant was convicted and sentenced in the Superior Court on indictments charging him with breaking and entering in the nighttime with armed assault (G. L. c. 266, § 14), assault and battery (G. L. c. 265, § 13A), armed robbery (G. L. c. 265, § 17), and rape (G. L. c. 265, § 22).[1] On July 7, 1977, he moved under G. L. c. 278, § 29 (see now Mass.R.Crim.P. 30[b], 378 Mass. 900 [1979]), for a new trial on the basis of newly

---

[1] These indictments arose out of an incident which occurred on the morning of June 13, 1976.

discovered evidence. That motion alleged, in pertinent part, that on May 7, 1977, while the defendant was serving his sentences, several crimes, including a rape, were committed in the same apartment complex where the incident attributed to the defendant had taken place, that the circumstances of the later crimes were similar to those of the offenses for which the defendant had been convicted, and that one Joseph L. Powell who "looked like" the defendant had been identified by the victim of the 1977 incidents as the person who had assaulted her.[2] On February 27, 1978, the judge allowed the motion and ordered a new trial. His decision was based on the parallel circumstances between the 1976 and 1977 crimes and on the physical resemblance between Powell and the defendant. The judge's memorandum characterized this resemblance as "remarkable" to the point that "if they were identical twins, which they are not, it would come as no surprise."

The defendant was retried in February, 1979, in the Superior Court before a jury and a different judge. The jury returned verdicts of guilty on all four indictments. The defendant argues that the judge erred in failing to instruct the jury adequately on the issue of identification. We are satisfied that the judge's charge properly dealt with the question, and as a consequence, that the convictions before us[3] must be affirmed.

The evidence and events at the second trial relevant to this appeal may be summarized as follows. In the early morning hours of June 13, 1976, the victim became aware of the fact that a black male had entered her basement

---

[2] Powell's convictions for the 1977 crimes were reversed by this court in *Commonwealth* v. *Powell*, 10 Mass. App. Ct. 57 (1980), because of the trial judge's failure to instruct the jury with respect to the lesser included offense of burglary on the indictment which charged Powell under G. L. c. 266, § 14, with breaking and entering in the nighttime with armed assault.

[3] The conviction on indictment 04726 for assault and battery was placed on file with the defendant's consent and as a result is not a part of this appeal.

apartment by breaking through a window. Thereafter, this man armed himself with a steak knife from her kitchen, took money from her purse, beat the victim about the face, and twice sexually assaulted her. He left the apartment about 6:00 A.M. Over the approximate ninety-minute span of the incident, the victim conversed with her assailant and "studied his features . . . thoroughly."[4] She also observed, in the course of the sexual assault, that her assailant was not circumcised. It was stipulated that the defendant was not circumcised on June 13, 1976.[5] The victim provided the police with a description and the following day viewed a police album containing about fifty photographs of black males (but which did not contain a photograph of the defendant) without making an identification.

On August 2, 1976, at about 10:30 P.M., while walking towards her parked automobile, the victim observed the defendant. She exchanged a series of glances with him, recognized him to be her assailant and immediately notified a security guard that he had been in her apartment a few

---

[4]The victim testified that the outside grounds in the vicinity of her apartment were well lighted, that her basement windows were covered by sheer curtains and translucent shades, and that there was a "reasonable amount of light penetrating" into her apartment throughout the incident, initially from the outside artificial lighting and later from early morning sunlight. In the early moments of the intrusion, she saw her assailant from a distance of about ten feet. During part of the incident (an attempt at sexual intercourse that lasted about one hour), she observed his face under the light from the face of a clock radio on her bedstand. She testified that during the approximate ninety-minute period she did not have any trouble observing his face. After the incident, she described the man to the police as a brown-complexioned Negro, about five feet eight inches tall, weighing between 130 and 155 pounds and dressed in a khaki shirt, dungarees and sneakers. She stated that she was confident throughout the whole incident that she could recognize the individual again if she saw him.

[5]The judge excluded the Commonwealth's offer of evidence that the defendant had been circumcised some time in the summer of 1978. There was no direct evidence as to whether Powell was circumcised prior to June 13, 1976. A police officer who had investigated the 1977 incident testified that the victim in that case had told him that her assailant was circumcised.

weeks earlier. This information was communicated to the police, who assembled a new twelve photograph array which, when shown to the victim on August 4, 1976, resulted in her positive identification of the defendant ("That's him").[6] The victim also made an in-court identification of the defendant without objection, stating at the time that there was "no doubt whatsoever in [her] mind" that the defendant was her assailant.

The defense was based in large part on testimony from the victim of the May 7, 1977, rape. The victim of the 1977 offense recounted at length the circumstances of her assault and the course of the police investigation which led ultimately to the arrest and conviction of Joseph Powell. Additionally, Powell was brought into court and identified by the 1977 victim as her assailant.[7] During a voir dire concerning Powell's possible testimony, the victim in the present case viewed both Powell and the defendant frontally and in profile. When the jury was recalled, she again positively identified the defendant as the man who had been in her apartment, repeating the statement that she had "no doubt whatsoever."

The defendant also presented testimony through himself and his girlfriend that he had moved into the apartment complex in the late winter of 1976 and that he was in his apartment at the critical times on the night of the incident. He denied seeing the victim near her vehicle outside the apartment complex on August 2, 1976. Cross-examination of the defendant was extensive and included his impeachment by prior convictions of receiving stolen property, unarmed robbery, and assisting a prisoner to escape.

---

[6] No question has been raised as to the propriety of the photographic selection under the standards set forth in *United States* v. *Wade*, 388 U.S. 218 (1967), *Simmons* v. *United States*, 390 U.S. 377 (1968), and their progeny.

[7] This victim stated that there was "no doubt" in her mind that Joseph Powell was her attacker and she testified that she was capable of distinguishing between Powell and Simmons on the basis of their respective physical appearances.

The balance of the trial was devoted to development of the similarities and dissimilarities between the 1976 and 1977 assaults, to testimony concerning physical differences between Powell and the defendant,[8] and to other circumstances tending to prove or disprove Simmons's culpability. The victim's ability to make an accurate identification was argued to the jury in the respective closings of counsel. Prior to final argument, defense counsel filed detailed requests for instructions on the issue of identification which were based largely on the discussions of identification instructions contained in *United States* v. *Barber*, 442 F.2d 517, 526-528 (3d Cir.), cert. denied, 404 U.S. 958 (1971), and *United States* v. *Telfaire*, 469 F.2d 552, 558-559 (D.C. Cir. 1972). After a charge conference (see now Mass.R.Crim.P. 24[b], 378 Mass. 895 [1979]), the judge allowed some of the requests, denied the remainder, and generally indicated how he would cover the identification question. At the conclusion of the charge, defense counsel registered a timely objection to the judge's failure to give all of his requested instructions.

The retrial of this case took place after this court's decision in *Commonwealth* v. *Rodriguez*, 6 Mass. App. Ct. 738 (1978), but prior to the opinion of the Supreme Judicial Court in the same case (378 Mass. 296 [1979]), in which the model instructions suggested in the *Telfaire* decision concerning identification issues were generally approved for use by our trial judges. 378 Mass. at 302. We have recently indicated that a judge is not required to give the specific language of the model, but that he has the discretion to tailor the exact language of his charge to the proofs and con-

---

[8] The victim in this case described Powell as appearing to her as having a heavier build than the defendant. The victim of the 1977 incident described her assailant as having acne or pockmarks on his face, a pug nose, and, on the night of the incident, a distinctive odor about his body of "sulfur." She also recognized him from his voice. But see *Commonwealth* v. *Powell*, 10 Mass. App. Ct. at 59-61. The facial characteristics described by the victim of the 1977 assault were not part of any description given by the victim in this case.

tentions of the particular case on trial.[9] See *Commonwealth* v. *Alleyne*, 10 Mass. App. Ct. 28, 30 (1980); *Commonwealth* v. *Durant*, 10 Mass. App. Ct. 768, 771-772 (1980). See also *Commonwealth* v. *Rodriguez, supra* at 302; *United States* v. *Kavanagh*, 572 F.2d 9, 11-13 (1st Cir. 1978). We now turn to the question whether, in the context of this record, "the charge adequately directed the jury's attention to the question of a possible mistaken identification [without placing improper] stress on the veracity of a particular witness." *Commonwealth* v. *Alleyne, supra* at 31. *Commonwealth* v. *Rodriguez*, 6 Mass. App. Ct. at 743-744.

Prior to empanellment, the judge primed the jury on the identification issue by instructing the venire that testimony by the witnesses in the case as to their observations would be important and that "[t]he critical juror . . . will examine [the] opportunity for observation, the fact of observation, and the fact of memory, and will attend to that during the course of the trial." Throughout the trial, the jury's attention was intensely focused on the reliability of the victim's identification and on the question whether Powell might have committed the crimes. Defense counsel's extensive cross-examination of the victim concentrated on the circumstances prevailing on the morning of the assault and their bearing on a good identification. Defense counsel argued these circumstances to the jury along with the discrepancies and infirmities in the testimony.

The part of the charge on the presumption of innocence was clearly and correctly stated, and the judge told the jury several times that the Commonwealth had the burden of

---

[9] The Federal Circuit Court of Appeals in *United States* v. *Barber*, 442 F.2d at 527-528, emphasized that while it was useful to have "trial-tested and appellate approved" instructions available as resources for the purposes of supplying guidelines to the trial courts, nevertheless "instructions to the jury must be molded to fit the factual complex of each case [because] [a]n instruction approved in one case . . . may not be sufficient for the particular case at bar if the comparative circumstances are not identical or substantially similar."

establishing each and every element of the various crimes charged beyond a reasonable doubt, explaining that concept by reading lengthy excerpts from *Commonwealth* v. *Webster*, 5 Cush. 295 (1850). The judge singled out the question of identification as "[o]ne of the significant issues in the case," and informed the jury on three separate occasions in the context of the identification charge that the prosecution "has the burden of proving identity beyond a reasonable doubt." He also stated that the defendant has "no corresponding burden of proof." In addressing whether the Commonwealth had met this burden, he instructed the jury to consider all of the evidence, both "circumstantial . . . and . . . the so-called eye-witness testimony," and to make sure that "the testimony of a witness as to identification . . . [was] received [by them] with caution and scrutinized with care." As to the testimony of the identifying witness, he indicated that "identification is an expression of [the] belief . . . of the witness" and that it was linked to witness perception including "the opportunity the witness had to observe the offender at the time of [its commission] and [to] make a reliable identification later." He concluded his remarks with the admonition that the defendant should be found not guilty "[i]f you are not convinced beyond a reasonable doubt that [he is] the person who committed the alleged crime[s]." The charge avoided the vice of linking the reliability of the identification to the victim's veracity.

Most of the foregoing comports with the essentials of an acceptable identification charge as discussed in both *Rodriguez* decisions. It is obvious to us as well that the judge had studied the guidelines discussed in *United States* v. *Barber*, 442 F.2d at 528, and that he gave the defendant the most favorable aspects of the charge suggested in that case and omitted what might have been harmful. For example, he stressed, as *Barber* recommends at 528, warnings that the "witness' testimony as to identity must be received with caution and scrutinized with care" and that the burden of proving identity beyond a reasonable doubt rested on

the prosecution. Significantly, he refrained from following the suggestion in *Barber* (at 528) that the jury be instructed on acceptance of the victim's identification as a statement of fact if they found that (1) the witness had the opportunity to observe the accused; (2) the witness was positive in her identification; (3) the witness' identification testimony was not weakened by a prior failure to identify or by a prior inconsistent identification; and (4) after cross-examination, the testimony remained positive and unqualified. The victim's testimony in this case met these four conditions, but a charge to this effect might well be viewed on close appellate scrutiny as subtly tipping the scales against the defendant.[10]

The defendant admitted at the argument before us that all of the circumstances outlined in his requested instructions bearing on the reliability of the identification were aired at the trial and discussed in the closing arguments.[11] In the main, the defendant contends that it was more important for the jury to have heard the specific guidelines (lighting conditions, circumstances at the scene, etc.) for evaluation of identification testimony from the judge than from the lawyers in their summations. As an abstract proposition this may be true. But it is not true that a long and detailed instruction is any better than a short and clear one. We are concerned with the charge as a whole (*Commonwealth* v. *Ramey,* 368 Mass. 109, 114 [1975]), and with the impressions it conveyed to a reasonable juror. See *Sand-*

---

[10] In the circumstances, it would not have been helpful to the defendant to repeat those portions of the *Telfaire* charge (469 F.2d at 558) which advise the jury to take into account "the strength of the identification" and the fact that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from a one-on-one confrontation. In this case, the victim had never identified anyone else as the perpetrator and had made a prompt identification from a fairly composed photographic array.

[11] It was also agreed that the last two paragraphs of the defendant's requested instructions were not neutrally cast and were properly rejected.

*strom* v. *Montana,* 442 U.S. 510, 514 (1979); *McInerney* v. *Berman,* 621 F.2d 20, 23-24 (1st Cir. 1980). There is no question that every reasonable person sitting on the jury in this case had been sensitized throughout the trial to the possibility that the victim's identification was mistaken. We are satisfied that if there were any defects in the identification instructions, they were essentially trivial and well beyond the zone of reversible error.

The judgments on indictments 04727, 04728 and 04729 are affirmed.

*So ordered.*