COMMONWEALTH *vs.* MAURICE M. BROWN.

No. 88-P-816.

Suffolk.    December 14, 1988. — February 28, 1989.

Present: PERRETTA, KAPLAN, & SMITH, JJ.

*Alibi. Evidence,* Exculpatory.

The judge at a criminal trial properly excluded evidence offered by the de-
fendant, intended to show that another person who resembled the defend-
ant had recently committed a similar crime by a similar method, where
the crime charged and the "similar" crime shared no singular features
as to connect them to a single putative offender and where there was
little assurance that the defendant did not commit the "similar" offense.
[75-77]

INDICTMENTS found and returned in the Superior Court De-
partment on April 17, 1986.

The cases were tried before *Robert A. Mulligan,* J.

*Diana L. Maldonado,* Committee for Public Counsel Serv-
ices (*Bruce R. Bono,* Committee for Public Counsel Services,
with her) for the defendant.

*Sharon B. Soffer,* Assistant District Attorney, for the Com-
monwealth.

KAPLAN, J.   Twelve persons lived in a second-floor, six-
room apartment at 203 Columbia Road in the Dorchester district
of Boston: Carol Joseph Headley and her three children; Carol's
brother Carlton Joseph, his wife Louise, and their five children;
and a friend, Ian Wade, whose house had recently "burned
out." About 7:30 P.M., January 29, 1986, with all present in
the apartment, there was a knock on the door, Carlton opened
it, and three armed men, two of them masked, pushed their
way in. The man without the mask, later identified (as we
shall see) as the defendant, Maurice Brown, went through the
rooms and ordered the occupants about, so that the twelve were

disposed thus: in the living room, Carlton, under the guns of the masked men; in the front bedroom, all the rest except three of the children, covered by the other gunman; two of the three children in a back bedroom and the third in "Carol's room," all three unattended.

The masked men beat Carlton repeatedly and took from him gold chains and other valuables. At the same time the other gunman was seizing gold chains from Louise, and Ian Wade.

A gunshot sounded from the living room and a voice was heard, "I got shot." The gunman quit the front bedroom, threatening to shoot anyone who moved, and rushed to the living room. It was not Carlton who had been shot; when Carlton put up resistance, a gun in the hand of one of the assailants had gone off and wounded the other man. The three intruders fled the apartment and the man without a mask was observed by the child Caroline through a window as he entered a station wagon in the street below. The episode took about twenty minutes.

The captives in the front bedroom had their gunman in clear view. Carol described him as about seventeen or eighteen years old, five feet, seven or eight inches in height, slim build, dark-skinned, clean shaven, short hair, wearing jeans, pullover Adidas sweatshirt with hood, and jacket.[1] Others — Carlton, Ian, Barbara, and Caroline — gave similar or consistent descriptions; however, Barbara (aged thirteen at trial) and Caroline (eleven) (Carol's children) said the man had some facial hair, and Ian said he was five feet, ten inches tall and weighed about 165 pounds. In fact the defendant Brown was five feet, ten to eleven inches tall, aged twenty-two at trial, and according to his mother, sister, and girlfriend had been growing a little goatee and mustache since he was nineteen.

The police exhibited twenty-nine pictures of black males, aged eighteen to twenty-three, to six of the victims, Carol, Carlton and Louise Joseph, Caroline, Barbara, and Greisha (the

---

[1] Carol said she recognized the gunman as the man she had seen on two occasions playing a "three card game" at Dudley station. She recognized him as he came into the apartment.

Josephs' child, aged fifteen). The array was shown separately to each of the viewers, and precautions were taken against communication among them. Five picked out the picture of the defendant Brown. Louise was reluctant to look at the array and did not make a selection. Carol, Caroline, and Barbara pointed out Brown confidently at the trial as the man without a mask; Carlton said he was not absolutely certain; Greisha did not testify.

The foregoing will serve as a summary of the Commonwealth's case upon the trial of the charges mentioned in the margin.[2]

On his part the defendant offered evidence of alibi. The girlfriend and the sister of Brown testified that he and the girlfriend were shopping for a waterbed on January 29 and returned to Brown's mother's house about 7:30 P.M. A receipt showed final payment on a waterbed from Waterrest Waterbeds on that date, but the name on the slip was that of the girlfriend, Lisa Evans; Brown's name did not appear and the salesperson did not remember that anyone accompanied Evans. The sister said she recalled the date because Brown was excited about buying the bed and had given her money to play the State's daily lottery. She said she bought a ticket and had the right number but discovered she could not turn it in because she bought the ticket too late to count that day, January 29. She remembered seeing the number on television at 7:55 in the company of Brown and Evans. The ticket, however, was not produced.

In light of the evidence summarized above, the judge correctly denied motions for required findings made at the close of the Commonwealth's case and again at the close of trial. The question for review arises on the judge's exclusion, after voir dire, of evidence offered by Brown intended to show that it was not he, but another man, a supposed look-alike, who committed the crimes in suit.

---

[2] One count of breaking and entering a dwelling in the nighttime with intent to commit a felony, to wit: armed robbery, G. L. c. 266, § 16; one count of armed robbery, G. L. c. 265, § 17; two counts of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A.

At voir dire one Keith Wilkie testified for the defense that a liquor store in the neighborhood, where he worked, was robbed on January 25. Two men entered the store. One wore a down jacket, which covered his upper body and arms, and a hat with flaps covering his ears. This man stuck a gun in Wilkie's face and ordered him to lie down on the floor. The second man drew a shotgun from his coat and ordered the store manager to lie down. The robbery was over in three minutes. At the police station, Wilkie examined about a hundred pictures. He thought Brown's face was a lot like that of the man in the down jacket, but he did not select the picture to make an identification. Brown evidently came under suspicion for the liquor store holdup by other means not disclosed at voir dire.[3] He was charged with armed robbery. As it happened, Wilkie was a correction officer at the time at Deer Island house of correction and, hearing that Brown was in custody there, stopped by his cell and for a moment observed him lying on his back. Wilkie thought this was the man in the picture but he was not the man who robbed the store: the robber, he thought, had more muscular arms and a rounder face than Brown and was taller than Brown. He figured Brown was about five feet, seven inches — a misjudgment.

Under cross-examination, Wilkie testified that his, Wilkie's, mother and Brown's mother had known each other for more than ten years and that he had spoken with Brown's mother about the liquor store robbery. The defense then called Mrs. Brown, who testified that her acquaintance with Mrs. Wilkie was not close, but that she had spoken with Mrs. Wilkie and Keith Wilkie and asked him to testify at the hearing on the robbery. After Wilkie's testimony at that hearing the charges against Brown in connection with the liquor store robbery were dropped.

The judge did not err in excluding from trial this material developed at voir dire. The broad due process right of a defendant to produce witnesses to establish a defense eventuated in "a rule allowing a defendant to introduce evidence that another

---

[3] Possibly through another witness to the holdup, but no such witness was called at voir dire.

person recently committed a similar crime by similar methods, since such evidence tends to show that someone other than the accused committed the particular crime." *Commonwealth* v. *Jewett*, 392 Mass. 558, 562 (1984). Apart from considerations of proximity in time and location, the instant and the similar crime must share singular features or present striking resemblances of method — without such limiting conditions, the triers may be exposed to a farrago of evidence too remote to count. See *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979); *Commonwealth* v. *Harris*, 395 Mass. 296, 300-301 (1985); *Commonwealth* v. *Rosario*, 21 Mass. App. Ct. 286, 291-292 (1985). Moreover, there must be reasonable assurance that the defendant at bar did not commit the "similar" offense, that it was in fact committed by someone else; thus the cases admitting evidence of similar crimes customarily establish that the particular defendant was in custody or in jail or in some like predicament at the time. See *Commonwealth* v. *Murphy*, 282 Mass. 593, 596 (1933); *Commonwealth* v. *Keizer*, 377 Mass. at 266; *Commonwealth* v. *Jewett*, 392 Mass. at 561. See also *Commonwealth* v. *Simmons*, 11 Mass. App. Ct. 156, 157 (1981); *Commonwealth* v. *Bettencourt*, 20 Mass. App. Ct. 923, 924 (1985).

Here the two criminal events were commonplace or pedestrian; there was nothing in them so striking or salient as to connect them to a single putative offender. That Brown was evidently sufficiently identified to be charged initially with the liquor store robbery (see note 3) and then found (by Wilkie) to be not the man, but resembling him, suggests a possibility that a look-alike committed both crimes. Cf. *Commonwealth* v. *Simmons*, 11 Mass. App. Ct. at 157; *Commonwealth* v. *Vaughn*, 23 Mass. App. Ct. 40, 43 (1986); Annot., 50 A.L.R. 4th 1049 (1986). But there was nothing to establish that Brown was present elsewhere at the time of the liquor store robbery, and little to confirm that Brown was not in fact the gunman there. Where Wilkie speaks of a difference in musculature between Brown and the gunman, it is hard to see how Wilkie could judge, since the liquor store robber was wearing a burly jacket. As to the matter of height, when the misjudgment of

Brown is corrected, we may, for all we know, have a height corresponding to that of the liquor store intruder. (All this is apart from Wilkie's credibility as possibly frayed by Mrs. Brown's intervention.)

The story told at voir dire was flimsy, and the judge did not commit error in declining to admit it at trial.

*Judgments affirmed.*