COMMONWEALTH *vs.* WILBERT SCOTT.

Middlesex. September 5, 1990. - December 17, 1990.

Present: LIACOS, C.J., NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Homicide. Evidence,* Exculpatory, Relevancy and materiality, Prior mis-
conduct. *Felony-Murder Rule. Dangerous Weapon. Witness,* Impeach-
ment. *Identification. Practice, Criminal,* Trial of issues together.

On the record of a hearing on a criminal defendant's motion that he be
allowed investigatory access to the victim of a crime of a similar nature
committed by a person other than the defendant, the judge properly
ruled that the proposed witness did not have material information and
properly denied the motion. [815-817] O'CONNOR, J., dissenting.

Evidence of a criminal defendant's prior bad acts, assaulting one woman
and harassing two others a few days before the victim was killed, were
properly admitted at his trial to show the defendant's sexual frustration
and thus his plan, motive, and intent to procure a sexual encounter at
the time of the murder of the victim. [817-820] O'CONNOR, J.,
dissenting.

Evidence at a first degree murder trial was sufficient for the jury to find
that the gag tied around the victim's face was, as used, a dangerous
weapon, aggravating the evidence of attempted rape, so that the ele-
ments of felony-murder were established beyond a reasonable doubt.
[820-823]

At a murder trial the prosecutor properly impeached a Commonwealth
witness who denied having identified the defendant from a photo array
by calling the police officer who had shown the array to the witness to
contradict the witness. [823-825] O'CONNOR, J., dissenting.

In a murder case, the defendant did not demonstrate that the successive
photographic arrays shown to one witness were unnecessarily suggestive
in violation of his due process rights and the judge correctly denied the
defendant's motion to suppress the identification of him from the final
array. [825-826]

The judge at a murder trial did not err in denying the defendant's motions
for a bifurcated trial on the issues of criminal conduct and criminal
responsibility. [826-827]

INDICTMENT found and returned in the Superior Court Department on September 23, 1986.

The case was tried before *John Paul Sullivan*, J.

*Hugh Samson* for the defendant.

*Catherine E. Sullivan*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, Wilbert Scott, was convicted by a jury on October 8, 1987, of murder in the first degree. He appeals from his conviction. He asserts various claims of error, each of which we discuss below. We affirm the conviction.[1]

The evidence before the jury was as follows. The victim, a nineteen year old woman, left her job as a nurse's aide at the Bolton Manor Nursing Home in Marlborough at approximately 9 P.M. on Monday, July 28, 1986. She walked toward her boy friend's apartment, about one and one-third miles away. Four motorists testified that they saw a young woman wearing a white uniform, walking along Bolton and Lincoln Streets in Marlborough. The victim did not arrive at her boy friend's apartment.

Three days later, on the afternoon of Thursday, July 31, 1986, the victim's body was found in a wooded area near the corner of Lincoln and Cashman Streets in Marlborough. She was lying on her back, wearing only her white uniform skirt. Her bra was open in the front, exposing her breasts. Her shoes, socks, and underwear were found behind a rock nearby. A T-shirt and an oxford shirt, both of which belonged to the victim, were tied together behind her head and used as a gag to cover her mouth. The victim's face was abraded and bruised. From the injuries, it was determined that she was struck in the face at least three times with an object consistent with being either a closed fist or an open hand. The blows to the face rendered the victim unconscious or semi-conscious. The reduced level of consciousness made it

---

[1]The defendant does not ask us to exercise our power under G. L. c. 278, § 33E (1988 ed.), to review the entire case. We have nonetheless reviewed the entire case as required by statute. We conclude that there is no reason to exercise our power under § 33E.

impossible for the victim either to untie the gag or to free her tongue, which was pushed back by the gag. The victim died from a combination of head injuries and asphyxia by the gag. There was no evidence of sperm or seminal fluid; there was no evidence of injury to her genital organs.

The defendant lived in an apartment across the hall from the victim's boy friend. He was arrested on August 4, 1986. After he was arrested, the police searched the defendant's apartment pursuant to a search warrant and seized several items of clothing and bedding belonging to the defendant.

At trial, the Commonwealth introduced the testimony of Special Agent Andrew Gary Podolak of the Federal Bureau of Investigation. Podolak testified that he performed an examination of two Negroid hairs found on the victim's body. One Negroid hair exhibited the same microscopic characteristics as the defendant's hair. This hair was found embedded in the victim's sock. Another Negroid hair, which did not match the hair characteristics of the defendant, was found on the victim's thigh. In addition, six Caucasian hairs, which matched the microscopic characteristics of the victim's hair, were found on clothing seized at the defendant's apartment. One of these hairs was found on the inside of a pair of white shorts owned by the defendant.

A witness testified that she saw the defendant wearing shorts that were a "light color" on the night the victim was killed. The other hairs belonging to the victim were found on the defendant's underpants, socks, and dungarees.[2]

After his arrest, and in his testimony at trial, the defendant stated that on July 28 he got home from work at 6 P.M. and went to bed because he was not feeling well. However, John Reilly, who lived a short distance from the empty wooded lot where the victim was found, testified that he saw

---

[2]The victim often stayed at her boy friend's apartment. The apartments in the building did not have individual bathrooms; instead, there was a communal bathroom on each floor. Defense counsel throughout the trial raised the possibility that the hair transfers resulted from the use of common bathrooms and laundry facilities.

the defendant walking by his house a few minutes before 9 P.M.

On Tuesday, August 5, 1986, the defendant, while being held in a cell at the Marlborough District Court, spoke with another inmate. The inmate, who was aware that the defendant was arrested for murdering a young woman, told the defendant that he hoped "it was worth it. You ain't going to get nothing for a long time." The defendant responded that "[s]he had firm breasts." The defendant also told the inmate that he had seen the victim in the halls of his apartment building and that she was "very pretty."

A few days after the defendant's arrest, a neighbor entered the defendant's apartment and saw several pornographic magazines on the floor. He noticed that the top magazine had an article about a serial killer, and he proceeded to read it. He testified at trial that the article was about a serial killer who had killed several young women by stuffing pieces of cloth into their mouths, gagging and eventually strangling his victims.

Finally, the Commonwealth introduced evidence that three young women were harassed by the defendant a few days before the victim's death. Karen Sullivan testified that on July 23, 1986, the defendant followed her from the store where she worked to her friend's apartment. On July 26, the defendant returned to the apartment house. Fifteen year old Kathy Boivin answered the door. After the defendant asked if she was alone, Boivin closed the door. Later that afternoon, as Boivin returned home, she saw the defendant across the street. He called her "beautiful," asked her to come over, and told her that he would not hurt her. Boivin continued walking.

On the evening of July 26, the defendant went to a bar in Marlborough and played pool with Lisa Sullivan, a pregnant twenty-four year old woman. After the game of pool, the defendant put his hand on Sullivan's wrist and asked her to go home with him. She refused. A few minutes later she left the bar. The defendant followed Sullivan. After Sullivan got into her automobile, the defendant jumped on the hood of her au-

tomobile and banged his fists against the windshield. Sullivan drove out of the parking lot, and the defendant fell off the automobile. Sullivan stopped for a red traffic light at a nearby intersection. She observed the defendant running towards her, and she drove away.

1. *Possible exculpatory witness.* Almost one year before the trial, the Commonwealth informed the defendant that another woman was assaulted on July 28, 1986, between midnight and 1 A.M., on Lincoln Street in Marlborough, a short distance from where the body of the victim in this case was found. The assault was reported to the Marlborough police department by a person other than the victim. The Marlborough police interviewed the woman. She confirmed that she was assaulted by a white male, five feet six inches or five feet seven inches in height, 150-170 pounds, dark hair, in his early thirties. On January 15, 1987, the defendant filed a motion for access to the victim, and, on February 3, 1987, a hearing was held. At the hearing, the prosecutor and the victim's own attorney argued that the potential witness was suffering from severe psychological trauma as the result of the assault and that she did not want to speak to anyone about the incident.[3] On February 11, 1987, the judge denied the defendant's motion. The judge did not give reasons for the denial of the motion.

The defendant argues that he has a right of investigative access to the victim of this other crime under the Fifth and Fourteenth Amendments to the United States Constitution and under art. 12 of the Massachusetts Declaration of Rights. We must determine whether the victim of the second crime had information which was both material and exculpatory.

It is well established that a defendant should be allowed to "introduce evidence that another person recently committed a similar crime by similar methods, since such evidence tends to show that someone other than the accused committed the

---

[3]The victim's attorney informed the court that the victim had been raped twice during the past nine years.

particular crime." *Commonwealth* v. *Jewett*, 392 Mass. 558, 562 (1984). We have stated previously that evidence involving crimes of a similar nature by a person other than the defendant must be admitted when "the acts of such other person are so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime." *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979), quoting *State* v. *Bock*, 229 Minn. 449, 458 (1949). See *Commonwealth* v. *Murphy*, 282 Mass. 593 (1933). In determining whether to admit evidence of crimes committed by individuals other than the defendant, the usual considerations of relevancy apply. *Commonwealth* v. *Jewett, supra.* It is for the trial judge to determine whether to admit or reject evidence of crimes committed by other individuals. *Commonwealth* v. *Lawrence*, 404 Mass. 378, 387-388 (1989). *Commonwealth* v. *Harris*, 395 Mass. 296, 300 (1985). We will not disturb the trial judge's decision unless justice requires a different result. *Commonwealth* v. *Keizer, supra. Commonwealth* v. *Murphy, supra* at 598.

We are not convinced that justice requires us to disregard the judge's ruling on the materiality of the evidence. It is true that the attacks occurred a short distance from, and within three or four hours of, each other. The defendant, however, did not present any evidence during the motion hearing which established that the method of operation of both crimes was similar. See *Commonwealth* v. *Brown*, 27 Mass. App. Ct. 72, 76 (1989) ("[a]part from considerations of proximity in time and location, the instant and the similar crime must share singular features or present striking resemblances of method"). Since we do not know the method of attack used by the second assailant, nor the factual characteristics of the second assault, we cannot say that justice requires us to disregard the judge's ruling that the victim did not have material information.

The defendant could have had access to the alleged exculpatory and material information by asking for a copy of the

police report.[4] Since the victim was unwilling to discuss the case with anyone, it is uncertain whether the defendant would have learned any relevant information, even if the judge had granted his motion. The victim could have ·declined to speak with the defendant's counsel. See *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 658 (1979). The police report, however, may have contained valuable exculpatory information for the defendant. If the defendant had made a specific request for the police report, and the report in fact contained exculpatory and material information, the prosecutor would have been constitutionally required to provide the report to the defendant. See *Commonwealth* v. *Gallarelli*, 399 Mass. 17 (1987); *Commonwealth* v. *Ellison*, 376 Mass. 1 (1978). The defendant had within his reach the information which, he now argues, was vital to his defense. He failed to pursue the remedies available to him. Thus, on this record, we conclude that the trial judge did not err in denying the defendant investigatory access to the victim of the second assault.[5]

2. *The defendant's prior bad acts.* Defense counsel objected to the introduction in evidence of the defendant's harassment of three young women a few days before the victim

[4]Both the Commonwealth and the defendant's counsel stated during oral · argument that they had not seen a police report involving the second assault. It is clear from the letter which the Commonwealth sent to the defendant almost one year before the trial began, however, that a Marlborough police officer spoke with the victim about the attack. Therefore, we assume that a police report does exist. See G. L. c. 41, § 97B (1988 ed.). As to the judge's power to order release of the police report, see G. L. c. 265, § 24C (1988 ed.), and G. L. c. 41, § 97D (1988 ed.).

[5]The defendant renewed his motion for investigative access to the victim once before trial and twice during the trial. The judge denied all the motions. After the fourth motion was denied, the defendant's counsel suggested to the judge that he would be willing to stop insisting on having access to the victim if the judge called on the victim to testify. We do not decide whether, if the defendant had formally requested that the victim be subpoenaed under G. L. c. 277, § 66 (1988 ed.), and the judge had denied the request, such a denial would have been error.

was killed. It is well established that the Commonwealth may not introduce evidence of prior bad acts by the defendant to prove bad character or a propensity to commit crimes. See *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985); *Commonwealth* v. *Stone*, 321 Mass. 471, 473 (1947). The Commonwealth, however, may introduce such evidence to prove intent, motive, identity, pattern of operation, or common scheme. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224, 225 (1986), and cases cited.

The Commonwealth filed a motion in limine to admit the evidence of the defendant's prior bad acts, arguing that the prior misconduct was evidence of the defendant's sexual frustrations. The trial judge granted the motion, ruling that the prior bad acts were relevant to the Commonwealth's theory of motive or intent.

The defendant argues that the incidents of harassment of the three young women were admitted to show propensity for criminal behavior and not to establish plan, motive, or intent. The defendant claims that the incidents of harassment had a low probative value since they were not sufficiently similar to the crime for which he was indicted. The defendant concludes that the admission in evidence of his prior misconduct was unduly prejudicial. See *Commonwealth* v. *Welcome*, 348 Mass. 68 (1964); *Commonwealth* v. *Key*, 21 Mass. App. Ct. 293 (1985). The Commonwealth argues that the defendant's overtures to the three young women were relevant to show the defendant's sexual frustration and thus his plan, motive, and intent to procure a sexual encounter at the time of the murder. We agree.

In *Commonwealth* v. *Bradshaw*, 385 Mass. 244 (1982), the prosecution's theory was that the defendant killed the victim because of frustration over a lack of money. The victim was demanding that a third party pay him a sum of money which the third party had already given to the defendant. In support of its theory, the Commonwealth portrayed the defendant's activities during the day of the mur-

der as a desperate search for money.[6] We found no error in the admission of the evidence, since it was relevant to show intent or motive.[7] In *Commonwealth* v. *Rancourt*, 399 Mass. 269 (1987), the defendant was charged with rape. In that case, we stated that the "defendant['s] attempt[ ] forcibly to enter an automobile in which two women were riding shortly before he entered the victim's automobile . . . is relevant on the critical issues of intent, motive, and consent." *Id.* at 275-276.[8]

It is for the trial judge to determine whether the prejudicial effect of evidence outweighs its probative value. The decision of the judge will be accepted on review unless the judge committed palpable error. See *Commonwealth* v. *Young*, 382 Mass. 448, 462-463 (1981). *Commonwealth* v. *Hoffer*, 375 Mass. 369 (1978). There was no such error in this case. The incident involving Lisa Sullivan, where the defendant followed her out of the bar, leaped onto the hood of her automobile, banged his fists against the windshield, fell off the automobile, and then ran after Sullivan as she drove away is probative evidence of the defendant's plan, motive, and intent to assault the victim in the instant case. The incidents involving the harassment of Karen Sullivan and Kathy Boivin are more problematic, since they did not involve physical violence or threats. The two incidents, however, when combined with the more serious harassment of Lisa Sullivan, were relevant evidence in showing that the defendant may

[6]The defendant in *Bradshaw* on that day sold his automobile, collected debts by stealing, vandalized and threatened others, and reacted violently to any attempts to tamper with his own property. *Id.* at 269.

[7]We also stated that the evidence was relevant, since it was "inextricably intertwined with the description of events on the [day] of the killing." *Commonwealth* v. *Bradshaw*, *supra*, quoting *Commonwealth* v. *Hoffer*, 375 Mass. 369, 373 (1978).

[8]The Commonwealth is correct when it argues that *Commonwealth* v. *Brusgulis*, 406 Mass. 501 (1990), is not applicable. In that case, the prior bad acts were committed four and ten years before the crime for which the defendant was indicted. It is difficult to establish plan, motive, and intent over a period of ten years. The probative value of the prior bad acts in this case is much stronger because they occurred two and five days before the victim was killed.

have been sexually frustrated. See *Commonwealth* v. *Rancourt, supra*; *Commonwealth* v. *Bradshaw, supra* at 269-270.[9]

3. *Evidence of rape and felony-murder.* At the close of the Commonwealth's case and again at the close of the defendant's case, the defendant moved for a required finding of not guilty on so much of the indictment as alleged murder in the first degree. The judge denied both motions. The judge, during the charge, instructed the jury that they could find the defendant guilty of murder in the first degree if they found premeditation or if they found that the defendant committed a felony punishable by life imprisonment. See G. L. c. 265, § 1 (1988 ed.). The judge explained to the jury that, in order to find the defendant guilty of murder in the first degree on the theory of felony-murder, they must find that the Commonwealth proved beyond a reasonable doubt that the defendant committed aggravated rape or attempted aggravated

---

[9]The defendant also argues that the testimony regarding the magazine article about the serial killer who gagged and strangled young women was unduly prejudicial. The judge, while recognizing that the testimony was prejudicial, ruled that it was evidence of modus operandi. The judge did not abuse his discretion. The way in which the serial killer murdered his victims, and the way in which the victim in the instant case died, were sufficiently similar for the testimony to be admitted as evidence of sexual desire and contemplation of modus operandi. See *Commonwealth* v. *King*, 387 Mass. 464, 469-472 (1982).

The defendant also raises an issue regarding undue prejudice. The defendant has a history of chronic paranoid schizophrenia. The Commonwealth, to further support its theory that the defendant was out walking on the night of July 28, 1986, wanted to show at trial that the defendant was taking a medication by the name of Prolixin Decanoate for his psychological problems and that one of the side effects of taking Prolixin is a need to walk. The parties stipulated that the defendant had taken the medication six days before (and three days after) the night of the incident. The judge, however, ruled that there could be no mention of the defendant's psychiatric history. The defendant claims that the judge erred when he denied his motion for a mistrial after a psychiatrist, testifying for the Commonwealth, stated that one of the side effects of Prolixin is the tendency of patients in psychiatric wards to pace. The judge, however, cured any possible prejudice by explaining to the jury that it "was an unfortunate example; has absolutely nothing to do with this particular case. Please accept it as simply an example. . . . [T]hat particular issue is not in this case. He was on the stand simply to testify on the matter of Prolixin D-E-C."

rape. See G. L. c. 265, § 22 (*a*) (1988 ed.). The jury found the defendant guilty of murder in the first degree on the theory of felony-murder. The defendant argues that the judge erred in denying his motions for a required finding.

The rule of felony-murder substitutes the intent to commit the underlying felony for the malice aforethought required for murder. *Commonwealth* v. *Troy*, 405 Mass. 253, 262 (1989). *Commonwealth* v. *Moran*, 387 Mass. 644, 649 (1982). In order to benefit from the principle of constructive malice embedded in the felony-murder rule, the Commonwealth must prove the malice element of the underlying felony beyond a reasonable doubt. *Commonwealth* v. *Chubbuck*, 384 Mass. 746, 756 (1981). *Commonwealth* v. *Watkins*, 375 Mass. 472, 487 (1978). The underlying felony must be inherently dangerous to human life, and it must be committed in circumstances which demonstrate the defendant's conscious disregard of the risk to human life. *Commonwealth* v. *Moran, supra. Commonwealth* v. *Matchett*, 386 Mass. 492 (1982). The commission of attempted aggravated rape satisfies the malice requirement of felony-murder. See *Commonwealth* v. *Troy, supra.*[10]

We must determine whether "the evidence was insufficient to persuade a rational trier of fact of each of the elements of the crime charged beyond a reasonable doubt." *Commonwealth* v. *Sherry*, 386 Mass. 682, 687 (1982). In making such a determination, we consider the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Wilborne*, 382 Mass. 241, 244 (1981). See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

There is no evidence that the defendant penetrated the victim. See *Commonwealth* v. *Gallant*, 373 Mass. 577, 578 (1977). We believe, however, that there was sufficient evidence for a rational jury to find that the defendant attempted to rape the victim. In order for acts of preparation to qualify

---

[10]The attempted commission of a crime punishable with imprisonment for life can also be the basis for felony-murder in the first degree. G. L. c. 265, § 1.

as an attempt, they must "come[ ] very near to the accomplishment of the [criminal] act." *Commonwealth v. Peaslee*, 177 Mass. 267; 272 (1901). The victim in the instant case was found on her back, wearing only her skirt, with her underpants removed, her shirt ripped off, her bra unfastened, and her breasts exposed. The underpants, along with the victim's socks and shoes, were found nearby behind a rock. One of the victim's hairs was found inside a pair of shorts that the defendant was seen wearing on the night on which the victim was killed. The hair was found underneath the side pocket next to the zipper. This was sufficient evidence for a rational jury to infer that the defendant attempted, but ultimately failed, to penetrate the victim.

Attempted rape, by itself, however, cannot be the underlying felony for murder in the first degree.[11] There must be evidence of aggravation. Under the statute, a rape becomes aggravated if it is "committed with acts resulting in serious bodily injury . . . or is committed during the commission or attempted commission of [an assault and battery with a dangerous weapon]." G. L. c. 265, § 22 (*a*).

A gag is not a per se dangerous weapon. It is for the jury to determine whether an object, which is not per se dangerous, was used as a dangerous weapon by the defendant, taking into account the purposes for which the object is intended and the manner in which it is used. *Commonwealth v. Appleby*, 380 Mass. 296, 307 (1980). *Commonwealth v. Farrell*, 322 Mass. 606, 615 (1948). *Commonwealth v. Marrero*, 19 Mass. App. Ct. 921, 922-923 (1984). The defendant argues that it was not foreseeable that the gag would cause death by asphyxia, and therefore that the gag was not used as a dangerous weapon. We disagree. We hold that there was

---

[11]In order to qualify as a felony-murder, the underlying felony must be punishable by life imprisonment. G. L. c. 265, § 1. Attempted nonaggravated rape is not punishable by life imprisonment. G. L. c. 265, § 22 (*b*) (1988 ed.).

sufficient evidence for the jury to find that the gag, as used by the defendant, was a dangerous weapon.[12]

4. *Impeachment of a Commonwealth witness.* James Woods testified that on July 28, 1986, the night on which the victim was killed, he was in Bert's Lounge, a bar down the street from where the defendant lived. Woods, who was the only black man at Bert's at the time, testified that he saw another black man walk into the bar. He described the man as five feet eight inches or five feet nine inches in height, with dark complexion. Woods, however, added that he did not look at the individual's face. Woods stated that a police officer later showed him an array of pictures, but that he was unable to choose the individual who entered Bert's that evening from the picture array. Woods was also unable to make an in-court identification of the defendant.

Marlborough police Officer Lawrence Moffa testified that on August 8, 1986, he showed Woods a photographic array and asked him whether he recognized the black man whom Woods saw at the bar. According to Moffa, Woods picked the defendant's photograph. At the request of defense counsel, the judge instructed the jury that Moffa's testimony had no probative value and was being offered by the Commonwealth to impeach Woods's testimony.[13] The defendant argues that the purported pretrial identification should not be admissible to impeach a witness who denies having identified the defendant in a pretrial identification procedure as the person whom the witness saw commit, not the actual crime,

---

[12]The acts perpetrated against the victim also resulted in serious bodily injury. The victim received several blows to the head, which caused abrasions and bruises. As a result of the blows, the victim was rendered unconscious or semi-conscious, and then put at obvious risk of asphyxiation.

[13]"Ladies and gentlemen, the present testimony of this witness, with respect to the conversation between this witness and James Woods is not offered to establish the fact that Mr. Woods made an identification of the defendant. It is offered for the very limited purpose to establish whether there was or was not an inconsistent statement made by Mr. Woods from testimony that he gave before us yesterday. You can decide if there was an inconsistent statement made, and you can consider that in evaluating his credibility."

but a collateral act not related in any way to the commission of·the crime. We disagree.

A party may impeach the credibility of his own witness by proving that the witness made prior inconsistent statements. G. L. c. 233, § 23 (1988 ed.).[14] Testimony that the witness made a pretrial identification, when the witness denies in court to having made the identification, is not admissible for its probative worth. *Commonwealth* v. *Daye*, 393 Mass. 55, 61 (1984). "[A] police officer's attribution to a witness of a positive identification denied by the witness at trial is not admissible to prove the identification." *Id.* A party, however, may impeach his own witness even when the witness denies having made the pretrial identification. *Commonwealth* v. *Swenson*, 368 Mass. 268 (1975). See also *Commonwealth* v. *Jones*, 407 Mass. 168, 169 (1990).

As the judge's instructions made clear, Moffa's testimony was offered not to prove that the defendant was in the bar on the evening of July 28, 1986, but to impeach Woods's denial of having identified the defendant from the photographic array. The judge did not err in admitting Moffa's testimony.

The defendant asks us to limit *Commonwealth* v. *Swenson*, *supra*, to those cases where the purported pretrial identification of the defendant occurred while the witness supposedly observed the defendant commit the actual crime. The defendant argues that the rule announced in *Commonwealth* v. *Swenson*, *supra*, should not apply in situations when the witness denies at trial having identified the defendant as the person who engaged in an act which, by itself, was innocent but which fits into the Commonwealth's theory of circumstantial evidence. The defendant argues that, in the absence of any other evidence that the defendant was in the bar that

---

[14]Before a party can impeach his own witness, the party must lay a foundation by asking the witness if the prior statements were in fact made and giving the witness an opportunity to explain. G. L. c. 233, § 23. See *Commonwealth* v. *Festa*, 369 Mass. 419 (1976). When the witness denies having made the prior statement, there is no need to ask the witness to explain. *Commonwealth* v. *Little*, 376 Mass. 233, 238 (1978). *Commonwealth* v. *Ferrara*, 368 Mass. 182, 194 (1975).

evening, there was no purpose in admitting Moffa's testimony. The defendant appears to confuse the difference between substantive and impeachment evidence. The fact that there was no other evidence placing the defendant at the bar on July 28, 1986, is not important since, as explained above, the evidence was not admitted to identify whom Woods saw entering the bar that evening. Instead, Moffa's testimony was admitted for the limited, and entirely appropriate, purpose of impeaching Woods's denial of having made a pretrial identification of the defendant.

5. *Failure to suppress identification.* John Reilly, a resident of Marlborough who lives a short distance from the wooded lot where the victim's body was found, identified the defendant from several photographic arrays as the man he saw walking down his street a few minutes before 9 P.M. on July 28, 1986. Sergeant Jusseaume of the Marlborough police department showed Reilly a group of four different photographic arrays over a period of several days. Jusseaume testified at trial that Reilly did not pick out any of the photographs in the first two arrays. Jusseaume also testified that the defendant's photograph was not included in the first two arrays. During the presentation of the third and fourth arrays, Reilly picked out two photographs, one of which was the defendant's. The photograph of the defendant which was shown to Reilly by Jusseaume was overexposed. On August 4, 1986, the defendant was arrested and a new photograph of him was taken. That evening, Detective Pitard of the Marlborough police department brought an array of photographs to Reilly's house. Included in the array was the new photograph of the defendant. Reilly identified the defendant's photograph. The defendant filed a motion to suppress the identification. The motion was denied.

The defendant argues that the repeated showings of the arrays to Reilly, coupled with the inclusion in the last array of a new, and apparently better, photograph of the defendant, was unnecessarily suggestive and thus violated his due process rights under the Fifth and Fourteenth Amendments, and under art. 12.

The defendant has the burden by a preponderance of the evidence to show that the challenged procedure was " 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to deny the defendant due process of law." *Commonwealth* v. *Venios*, 378 Mass. 24, 27 (1979), quoting *Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967). In other words, "[p]hotographic identification procedures are constitutionally invalid if the procedures were 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " *Commonwealth* v. *Thornley*, 406 Mass. 96, 98 (1989), quoting *Simmons* v. *United States*, 390 U.S. 377, 384 (1968). See *Commonwealth* v. *Botelho*, 369 Mass. 860, 867-868 (1976).

While the danger of misidentification is increased if the photograph of the same individual is included in different arrays, simple repetition is not sufficient, by itself, to make the identification procedures unnecessarily suggestive.[15] See *Commonwealth* v. *Paszko*, 391 Mass. 164, 169-170 (1984). The fact that a new, better photograph of the defendant was included in the last array from which Reilly positively identified the defendant is also not unnecessarily suggestive. See *Commonwealth* v. *Paszko, supra* at 171 (no unconstitutional suggestiveness when photographs are substantially different and witness made identification from more recent photograph). Since the identification procedures were not unnecessarily suggestive, the judge did not commit error in denying the defendant's motion to suppress the identification.

6. *Bifurcation.* Finally, the defendant argues that his two possible defenses, lack of criminal responsibility and identity, were inconsistent with each other. The defendant argues that, in pursuing a lack of criminal responsibility defense, it is in a defendant's interest to raise any past history of mental problems. In an identity defense, on the other hand, it is in a defendant's best interest to exclude all evidence of mental problems.

---

[15]This is especially true in a case where the photographs of several individuals, not just of the defendant, were repeated in the successive arrays.

A defendant does not have a constitutional right to a bifur-
cated trial as to the issues of criminal conduct and criminal
responsibility. *Commonwealth* v. *Bumpus*, 362 Mass. 672
(1972), judgment vacated and remanded on other grounds,
411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66
(1974), petition for habeas corpus sub nom. *Bumpus* v.
*Gunter*, 452 F. Supp. 1060 (D. Mass. 1978). See *Common-
wealth* v. *Haas*, 373 Mass. 545, 562 (1977), *S.C.*, 398 Mass.
806 (1986). The decision to grant a bifurcated trial is within
the sound discretion of the judge. *Commonwealth* v. *Sieg-
friedt*, 402 Mass. 424, 431 (1988). In denying the motion for
a bifurcated trial, the judge expressed concern that there
would be an overlap between the evidence needed to establish
the defendant's criminal responsibility and the evidence rele-
vant to the voluntariness of the defendant's statements to the
police, even if the defendant did not contest voluntariness.
The judge also noted that evidence of a lack of criminal re-
sponsibility was related to the mens rea component of the
crime. We find no abuse of discretion on the part of the
judge.

*Judgment affirmed.*


O'CONNOR, J. (dissenting). In *Commonwealth* v. *King*,
387 Mass. 464 (1982), a case in which the defendant was
charged with sexually molesting a young girl, this court held
that evidence of similar crimes by the defendant against the
victim's brother was admissible in the trial judge's discretion
because it was "logically probative," "corroborated the vic-
tim's testimony" concerning the defendant's conduct toward
her, and "rendered not improbable that the acts charged
might have occurred." *Id.* at 472. In *Commonwealth* v.
*Helfant*, 398 Mass. 214 (1986), the defendant, a physician,
was convicted of rape and drugging a person for unlawful
sexual intercourse in violation of G. L. c. 272, § 3 (1984 ed.).
The alleged criminal activity occurred in 1983. Over the de-
fendant's objection, two women, neither of whom was the

victim of the crimes being tried, were permitted to testify that, while they were the defendant's patients in 1981, the defendant had come to their homes and sexually assaulted them after injecting them with Valium. The court concluded that the judge had correctly admitted the "other crime" evidence with respect to the drugging charge, that the evidence was "highly probative," and that "[i]t tended to show the defendant's state of mind when administering the drug . . . and to make more probable the existence of the requisite illegal intent." *Id.* at 227. One other case is worthy of mention. *Commonwealth* v. *Zagranski, ante* 278 (1990), was a murder case in which the victim had had dealings with the defendant concerning a sale of land by the victim to the defendant. The court held that evidence that six weeks before the murder the defendant had proposed a scheme to purchase a different parcel of land, located in Jamaica, from a different, Jamaican owner, and then not to pay him but to kill him had been properly admitted at the trial. The court reasoned that the evidence "tended to identify the defendant as the person who killed the victim," and that the evidence was "relevant on the issue of the defendant's malice." *Id.* at 281.

The other crime evidence offered by the Commonwealth in those cases was held admissible by this court despite the fact that it required those defendants to defend not only against the accusations set forth in the indictments but against the "other crime" accusations as well, and despite "the danger that, because a defendant appears to be a bad man capable of, and likely to commit, such a crime as that charged, a jury might be led to dispense with proof beyond a reasonable doubt that he did actually commit the crime charged." *Commonwealth* v. *Stone*, 321 Mass. 471, 473 (1947). In *King*, *Helfant*, and *Zagranski*, the court held that the trial judges had not erred by measuring the probative value of the other crime evidence as so substantial that it outweighed its potential to be misused by the juries unfairly to the defendants.

In the present case, also, the Commonwealth was in possession of "other crime" evidence. Some of it tended to sup-

port the Commonwealth's case and some of it tended to weaken it. The Commonwealth was permitted to use the evidence favorable to it. Thus, over the defendant's objection, the Commonwealth was permitted to introduce evidence of three incidents involving the defendant's harassment of young women a few days before the victim was killed. The court concludes that there was no error in the admission of evidence that, after playing pool with Lisa Sullivan at a bar, the defendant put his hand on her wrist and asked her to go home with him and, after she refused, the defendant jumped on the hood of her automobile and banged on the windshield with his fists. That evidence, the court says, "is probative evidence of the defendant's plan, motive, and intent to assault the victim in the instant case." *Ante* at 819. Evidence of the other two incidents involving other young women was probative also, the court concludes, because that evidence, when combined with the Lisa Sullivan incident, demonstrates that "the defendant may have been sexually frustrated." *Ante* at 819.

I turn now to the other "other crime" evidence that was in the Commonwealth's possession but which, despite the defendant's best efforts (a matter discussed below), never was brought to the jury's attention. The prosecutor knew from the Marlborough police that the police had received information about another woman having been raped on the very same evening and in the very same neighborhood that the victim in the present case was sexually assaulted and killed. The rapist of the other woman was a white man, and therefore was not the defendant in this case, who is black. Surely, if the other crime evidence in *King*, *Helfant*, and *Zagranski*, and the evidence admitted in this case relative to the defendant's harassment of three women tended to prove that the several offenses in each case were committed by the same man, here, too, the other crime evidence, which the Commonwealth effectively withheld from the defendant by refusing to disclose to the defendant the name and address of the

victim-potential witness,[1] tended to prove that a white man, and therefore not the defendant, committed the crime charged.

Unlike the situation which is presented by a prosecutor offering evidence of a defendant's other crimes in order to prove that the defendant committed the indicted crime, a situation involving a serious risk of unfair prejudice to the defendant, no such risk is involved when the other crime evidence is offered by the defendant to discount the probability that the indicted offense was committed by him. Thus, we said in *Commonwealth* v. *Jewett*, 392 Mass. 558, 563 (1984): "We agree with the Appeals Court that the defendant need not 'demonstrate the same degree of similarity [between incidents] which the Commonwealth must demonstrate when seeking to introduce such evidence to establish the defendant's guilt.' *Commonwealth* v. *Jewett*, 17 Mass. App. Ct. 354, 358 n.4 (1984). *Perry* v. *Watts*, 520 F. Supp. 550, 560 (N.D. Cal. 1981) [,aff'd sub nom. *Perry* v. *Rushen*, 713 F.2d 1447 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)]. When a defendant offers exculpatory evidence regarding misidentification, prejudice ceases to be a factor, and relevance should function as the admissibility standard."

At the hearing on the defendant's original motion for access to the other crime victim, the prosecutor and the victim's attorney argued that, because of the psychological trauma resulting from the attack, the victim did not want to talk to anyone about the incident. The judge denied the motion without stating his reasons. The court states: "We are not convinced that justice requires us to disregard the judge's ruling on the materiality of the evidence." *Ante* at 816. One might fairly ask, "What ruling on the materiality of the evidence?" For all that appears, the judge simply decided to

---

[1]The prosecutor shared with defense counsel the police information about the other sexual assault. However, although the prosecutor knew the victim's name and address, she refused, with court approval, to share that information with the defendant. Thus, the defendant was unable to interview the victim or call her as a witness. He was denied the evidence as effectively as if he had never been told about it.

protect the victim. If so, the judge's objective was laudable, but it cannot be given precedence over the defendant's right to a fair trial. As we have said in other cases, "a defendant may introduce evidence to show that another person committed the crime or had the motive, intent and opportunity to commit it." *Commonwealth* v. *Graziano*, 368 Mass. 325, 329 (1975). See, e.g., *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979); *Commonwealth* v. *Murphy*, 282 Mass. 593, 597 (1933).

The court points to the defendant's failure at the motion hearing to demonstrate that the "method of operation" of the two sexual attacks was similar. *Ante* at 816. I submit that evidence that two sexual attacks occurred at nearly the same time and place, one of which was perpetrated by someone other than the defendant, while far from conclusive, surely bears on the question whether, beyond a reasonable doubt, the second attack was committed by the defendant. In addition, in view of the defendant's better than threshold showing of relevancy, it cannot be right that the defendant's inability to provide details of the other crime — details known only to the unknown attacker and the victim — disqualifies him from learning the identity of the victim who perhaps could and would have given him that very information. Such a result is inconsistent with the notion that the objective of criminal litigation is to see not only that "guilt shall not escape" but also that "justice shall be done." *Commonwealth* v. *Wilson*, 381 Mass. 90, 109 (1980), quoting *United States* v. *Agurs*, 427 U.S. 97, 111 (1976). The court should not credit an argument "that the defence must sustain a burden of establishing what might have been when the Commonwealth by its own action has rendered the sustaining of such a burden difficult if not impossible." *Commonwealth* v. *Balliro*, 349 Mass. 505, 517 (1965).

The court also reasons that "[t]he defendant could have had access to the alleged exculpatory and material information by asking for a copy of the police report," and that, via such report, "the defendant had within his reach the information which, he now argues, was vital to his defense." *Ante*

at 817. Because he failed to ask for the police report, the court "conclude[s] that the trial judge did not err in denying the defendant investigatory access to the victim of the second assault." *Ante* at 817. The court's reasoning begins with and necessarily depends on an assumption, set forth, *ante* at 817 n.4, as follows: "It is clear from the letter which the Commonwealth sent to the defendant almost one year before the trial began . . . that a Marlborough police officer spoke with the victim about the attack. Therefore, we assume that a police report does exist." Nothing in the record supports the court's assumption that there is a police report, nor does the record support the further assumption that, if there were a report, it would have been made available to the defendant. To the contrary, the record and the representation to this court by the Commonwealth's counsel during oral argument strongly suggest that there was no police report,[2] and G. L. c. 41, § 79D (1988 ed.), and G. L. c. 265, § 24C (1988 ed.),

---

[2]The letter to which reference is made in the court's footnote 4, *ante* at 817, identifies copies of numerous police reports being transmitted by the district attorney's office to defense counsel. Notably absent is a copy of a police report relative to the other crime. Instead, the letter states as follows: "Also, please be informed that it came to the attention of the Marlboro Police that an incident may have occurred, *not reported to them by the alleged victim*, on Monday night July 28, 1986 between 12 midnight and 1 a.m. behind the Old Brigham's Garage on Lincoln Street in Marlboro in the nature of a sexual assault. After learning this information, the police contacted a woman who confirmed that she was assaulted and described her assailant as a white male, 5'6" 5'7", 150-170 lbs., dark hair, collar length, early 30s (older man) deep voice. *She refused to speak to the police further*" (emphasis added). In addition, at the motion hearing, the prosecutor told the judge that she had told defense counsel about the other crime in the letter referred to above and that "[t]he only thing[s]" she did not release to defense counsel were the woman's name and address (at the woman's request), suggesting at least that if there had been a police report concerning the other sexual attack she would have given counsel a copy. The prosecutor also told the judge that "this woman did not report this to the police," and that she "did not want to come to the station and didn't come to the station to report what occurred to her on that night."

Lastly, during oral argument before this court on appeal, the Chief Justice asked, "Obviously there was a police report of some sort . . . or was there?" The Commonwealth's appellate counsel answered, "Well, I'm not sure your Honor that there was. I certainly can't say definitively that there was not. I can give the court my belief that there was none in the file that

both of which provide for the confidentiality of reports of rape and sexual assault, make it unlikely that the police would have honored the defendant's request for a report in any event. The court's assumptions are unfair to the defendant as is its conclusion based thereon. I would reverse the conviction on the ground that the defendant was entitled to, but was not given, the name and address of the other crime victim.

This appeal presents numerous issues. I have addressed one of them and shall address one more. James Woods testified as a Commonwealth witness that, on the night the victim was killed, Woods was in Bert's Lounge, which was a bar near the defendant's home in Marlborough. He testified that he saw a black man enter Bert's Lounge but that he did not look at the man's face and that, later on, when a police officer showed him an array of photographs, he was unable to identify any photograph as depicting the man. Woods also testified that he was unable to identify the defendant in court as the man that had come into the bar. A Marlborough police officer then was permitted over the defendant's objection to testify that, on August 8, 1986, eleven days after the incident, he had shown Woods a photographic array and that Woods had selected the defendant's photograph as depicting the man Woods had seen in the bar. Relying on *Commonwealth* v. *Swenson*, 368 Mass. 268 (1975), the court concludes that the police officer's testimony was properly admitted to impeach Woods's testimony. In my view, the court misunderstands *Swenson* and arrives at a conclusion that is unfair to the defendant. On this issue, too, I would reverse the judgment of conviction.

In *Commonwealth* v. *Swenson, supra,* the defendant was convicted of the armed robbery of Captain Bill's Cafe, Inc. Anthony Bevere was the bartender, and while he was standing at the bar a man armed with a rifle entered and announced that the café was going to be robbed. Bevere then

---

I reviewed at my own office. And there was information in the file but not a police report."

became aware of a second man, this one with a handgun, standing beside him. The second man placed the handgun against Bevere's side and ordered Bevere to transfer money from the cash register to a cigar box. The man with the handgun stood behind Bevere while the money was being transferred and then ordered Bevere to go to the far end of the bar. Then the man with the handgun, followed a minute later by the man with the rifle, left the café.

At a joint trial, Bevere identified one of the defendants in court as the man with the rifle. He did not identify the other defendant, Swenson, as the man with the handgun. In response to a question put by the prosecutor on direct examination as to whether he had identified a photograph of the man with the handgun, Bevere answered, "No." *Id.* at 271. In response to a further question of similar import, he said, "I did not give a positive identification of any photograph." *Id.* He subsequently testified on redirect examination that he had been shown Swenson's photograph and that, at that time, he "thought it resembled the man with the rifle."[3] *Id.*

In *Swenson, supra* at 272, the Commonwealth was permitted over objection to introduce the testimony of a police officer that, on the night of the robbery, he had shown photographs to Bevere and that Bevere picked out Swenson's photograph and said, "That looks like the guy that held the handgun." On appeal, this court held that the officer's testimony was properly admitted for impeachment purposes. *Swenson, supra* at 274. "The Commonwealth," the court said, "was entitled to impeach this witness's testimony, tending as it did to exculpate Swenson." *Id.*

The court's view that Bevere's testimony tended to exculpate Swenson was critical to its decision. Bevere had every opportunity to have a good look at the gunman and every reason to remember what he saw. Therefore, his testimony that, on the same evening, he was unable to identify a photo-

---

[3]In a footnote, the opinion in *Swenson* makes it clear that the witness's reference to the man with the rifle was a verbal slip and that he meant the man with the handgun. *Commonwealth* v. *Swenson, supra* at 271 n.2.

graph of Swenson as depicting the gunman strongly suggested that Swenson was not the gunman. Thus, Bevere's testimony was seriously damaging to the Commonwealth's case. It "tend[ed] . . . to exculpate" the defendant, and impeachment was called for.

The present case is significantly different from *Swenson.* Here, there was no evidence that Woods took a good look at the man who entered Bert's Lounge or had reason to remember his appearance eleven days later. Indeed, Woods testified that he had not looked at the man's face. Thus, nothing Woods said in direct examination would have warranted the jury in finding from Woods's inability to identify the defendant's photograph that the defendant had not been in Bert's Lounge on the night of the murder. The fact that Woods could not say that the defendant was there does not permit the inference that he was not. Furthermore, even if Woods's testimony had warranted a finding that the defendant was not at Bert's Lounge on the night of the murder, that fact would in no way have impaired the Commonwealth's case. The defendant was not on trial for being at Bert's Lounge. He was on trial for a murder said to have occurred elsewhere. Woods's testimony did not tend to exculpate the defendant. Thus, this case is critically different from *Swenson,* where the witness's testimony warranted the inference that the defendant had not committed the crime charged.

Because Woods's testimony did not harm the Commonwealth's case, impeachment of Woods — an attack on his credibility — by the party that called him to the witness stand — was uncalled for. What use were the jury logically to make of the officer's testimony that Woods had selected the defendant's picture as representing the man at Bert's Lounge? That testimony led nowhere except to the conclusion that Woods did indeed see the defendant at Bert's Lounge on the evening of the murder and to the further inference that the defendant, motivated by a consciousness of guilt, lied when he said that on the evening of the crime he had gone home from work and gone to bed feeling sick. The

testimony, while having no good purpose, risked serious and unfair prejudice to the defendant.

The judge instructed the jury that the officer's testimony was not admitted to prove that Woods had made a photographic identification of the defendant, but only to show that Woods had made an out-of-court statement that was inconsistent with his in-court statement. One must close his or her eyes to the obvious in order to be content that the instruction adequately protected the defendant from the risk that the jury would use the officer's testimony against the defendant. It had no other relevance. The instruction, well-motivated as it surely was, was a " 'recommendation to the jury of a mental gymnastic which is beyond, not only their power, but anybody's else.' *Nash* v. *United States*, 54 F.2d 1006, 1007 [(2d Cir.), cert. denied, 285 U.S. 566 (1932)]. 'The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction.' *Krulewitch* v. *United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring)." *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 681 (1974) (Hennessey, J., concurring). See *Bruton* v. *United States*, 391 U.S. 123, 128-137 (1968).

In this case, there was substantial evidence which, if believed, would have justified the conclusion beyond a reasonable doubt that the defendant is guilty as charged. However, the defendant should be considered guilty only if and when he is convicted after a fair trial. In my view, despite the conscientious efforts of the trial judge and counsel on both sides, he has not yet had a fair trial.