COMMONWEALTH vs. PETER G. SAUNDERS.

No. 97-P-1694.

Plymouth. April 8, 1998. - August 21, 1998.

Present: KASS, SMITH, & JACOBS, JJ.

*Burning a Dwelling House. Evidence,* Collateral matter, Joint enterprise, Relevancy and materiality.

At an arson trial, there was no error in the judge's allowing the prosecutor to cross-examine the defendant's expert, a forensic accountant called to testify to the soundness of the defendant's finances, on the issue of a Federal tax lien on the defendant's property which the prosecutor had agreed not to raise in his case-in-chief, where the evidence was relevant and admissible and where no unfairness was shown. [341-342]

At the trial of a criminal case, the judge did not err in excluding evidence proffered for impeachment on a collateral issue. [342-343]

At a criminal trial, certain hearsay evidence was properly admitted as the statement of a coventurer in a criminal enterprise, made during the pendency of the cooperative effort and in furtherance of its goal. [343-344]

At the trial of an arson indictment, the judge properly excluded as too remote a line of questioning of a police detective about other fires and other suspects. [344]

INDICTMENT found and returned in the Superior Court Department on January 22, 1992.

The case was tried before *Patrick F. Brady,* J.

*Kathy B. Weinman (Michael Galvin* with her) for the defendant.

*Paul C. Dawley,* Assistant District Attorney (*Bridget Middleton,* Assistant District Attorney, with him) for the Commonwealth.

KASS, J. Peter G. Saunders was convicted by a jury of arson, that is, burning a dwelling house. G. L. c. 266, § 1. His appeal raises evidentiary issues.

*Facts.* Taking the evidence in the light most favorable to the Commonwealth, the jury were entitled to find that the defendant

Saunders owned a property at 1900 Ocean Street, Marshfield, that he had come to regard as an albatross. He arranged with a tenant of his, Jeffrey Carley, to burn the place. For his trouble and considerable risk, Carley, a house painter who sometimes worked for Saunders, was to receive $500 as a down payment on a $10,000 to $20,000 fee to be paid when insurance proceeds became available. Carley subcontracted the arson task to Nick Fairclough, an old friend of his. Fairclough, who had a record as a small time criminal, worked with Carley's brother, Peter. Jeffrey Carley gave Fairclough $400 out of the $500 received from Saunders. Fairclough doused 1900 Ocean Street with gasoline on the night of March 1, 1991, ignited the fuel by tossing a book of lighted matches on it, and the premises were soon engulfed.

1. *Evidence of a tax lien against the defendant.* Part of Saunders's defense was that, as he had a net worth on the order of $3,000,000, it was implausible he would risk the hazards of arson, including being convicted of it, for marginal gain. The defense called as an expert Stanley Dennis, a forensic accountant, to testify to Saunders's financial soundness. In cross-examining Dennis, the prosecutor inquired whether Dennis was aware that Saunders had not paid Federal income taxes for 1988 and 1989, aggregating to roughly $109,000. Dennis said he was aware of this. Some questions on penalties and interests followed. The prosecutor then asked whether a Federal tax lien had been placed against the defendant's property on April 22, 1991. Defense counsel objected vigorously to that question and moved for a mistrial.

The reason for counsel's high state of agitation was his understanding that the Commonwealth would not introduce the tax lien. At the beginning of the trial, the defense had been prepared to move in limine to exclude evidence regarding the tax lien. Defense counsel explained to the trial judge that it would not be necessary to press the motion because the government had agreed not to introduce that evidence through various witnesses (a financial expert and Jeffrey Carley). The prosecutor confirmed this, with the reservation, "that if at some point it becomes an issue that I want to raise, I'll inform the court." Three pages later in the transcript, the prosecutor said again that the tax lien issue might come up and he would inform the court of its relevance.

In response to the recriminations of defense counsel, the

prosecutor explained that he had agreed not to introduce the tax lien in his case-in-chief and that, indeed, he had not. The prosecutor, for his part, protested that the defense had opened up the subject of Saunders's financial health. In the colloquy between the judge and the lawyers, the judge expressed his view that the evidence about the tax liability and consequent lien was relevant and, therefore, admissible. If Saunders had taxes unpaid for so long that the Internal Revenue Service had slapped a lien on him, one might infer that his financial status had been for some time not as rock solid as the witness in his behalf was trying to suggest. To be sure, the prosecutor had not fired a warning shot but the trial judge made the point that, as he was ruling the tax lien evidence admissible, no harm had been done. The evidence was damaging to the defendant, but not unfairly so. There is no suggestion that the defendant would not have called his accountant expert had he known he would be at risk of being questioned about the tax lien. Rulings on relevance are matters of discretion as to which we accord the trial judge deference. *Commonwealth* v. *Tobin,* 392 Mass. 604, 613 (1984). *Liarikos* v. *Mello,* 418 Mass. 669, 726 (1994).

Unlike the circumstances in *Commonwealth* v. *Felton,* 16 Mass. App. Ct. 63, 66 (1983), and *Commonwealth* v. *Lavin,* 42 Mass. App. Ct. 711, 712-713 (1997), the prosecutor's promise to refrain from questioning about the contested material was hedged by his statement that he might bring the subject up if the trial developed in a manner that called for his getting into the subject of the tax lien. It would certainly have been better had the prosecutor announced to the court that he was going to put questions about the tax lien, but from the record it is quite apparent that the judge, in that event, would have regarded the evidence admissible. The argument of perfidy by the prosecution is overblown. There was no error.

2. *Exclusion of testimony to impeach a witness who had previously testified.* The defense made an offer of proof that Stephen Kelley, who was seven years old at the time of the fire and eleven years old at the time of trial, would testify in a manner that impeached two prosecution witnesses, Fairclough (who had set the fire) and Peter Carley. Kelley had gone to a McDonald's restaurant with his uncle, Peter Carley, Fairclough (whom he referred to as Uncle Nick), and a cousin, Shane Carley. Kelley's account would describe that Fairclough had left the group and that the next time he saw him he was lying in the van in which

they had traveled and that Fairclough was now wet and filthy. A swamp lay between the rear of the McDonald's restaurant and the property at 1900 Ocean Street. Kelley would also testify that Peter Carley and Uncle Nick had told him and Shane not to say anything about the fire because the police would believe they had been involved.

That basic story had been told by Fairclough and Jeffrey Carley in their direct testimony for the prosecution.[1] Kelley's testimony would add nothing new except whether the group had paused to watch the fire. The judge acted within his discretion in deciding that Kelley, who was young and suffering from mental illness, had little to say that had not been brought adequately to the jury's attention by earlier examination. See *Commonwealth* v. *Gauthier*, 32 Mass. App. Ct. 130, 133 (1992). Whatever Kelley would testify to was collateral to the central question of whether Saunders had employed Jeffrey Carley to see to the burning of 1900 Ocean Street. See *Commonwealth* v. *Sherry*, 386 Mass. 682, 693 (1982). Contrary to the defendant's contention on appeal, the several offers of proof did not communicate that they would implicate Peter Carley as the architect of the arson.

3. *Hearsay admitted as utterance of one advancing the conspiracy*. Jeffrey Carley had undertaken to do some painting for Carol Andrews and parlayed that into several days' residence in her house after the fire. She testified that she heard him make several calls to Saunders and that in one of those calls he made arrangements for Saunders to come over to her house. A large sedan pulled up, she said, and Jeffrey Carley went out to talk with the driver. The conversation lasted from one hour to one hour and a half. Over objection, the prosecutor then asked Andrews, "[W]hen Jeff Carley came back into your house, what did he say to you?" She replied, less than responsively, "I asked him why Mr. Saunders had not come into the house during the course of the visit." "What," the prosecutor asked, "did he say?" The answer: "[H]e didn't want to." The judge allowed the question on the basis of the hearsay exception that a statement of a coconspirator or coventurer in a criminal enterprise that is made during the pendency of the cooperative effort and in furtherance of its goal is admissible. *Commonwealth* v. *Pleasant*, 366 Mass. 100, 103-104 (1974). *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). *Commonwealth* v. *Colon-Cruz*,

---

[1]Both had arrived at plea bargains with the prosecution.

408 Mass. 533, 543 (1990). At the time, Jeffrey Carley and Saunders were in the concealment phase of the arson conspiracy. In two respects, in support of the judge's ruling, the statement was related to the concealment: (1) as an expression by the defendant that he preferred to stay under wraps; and (2) as confirmation by Jeffrey Carley that it was Saunders he was talking to in secretive fashion. Above all, the answer, "[H]e didn't want to," had no particular prejudicial effect. The damaging evidence — which was admitted without objection — was that Saunders and Carley were closeted together for better than an hour.

4. *Evidence about other fires.* In his case-in-chief, the defendant called Frederick Teague, a detective on the Marshfield police force. He sought to question Teague about other fires and other suspects. The judge reasonably decided that line of questioning was too far afield and excluded it. *Commonwealth* v. *Scott*, 408 Mass. 811, 816 (1990). Compare *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979). The judge did allow ample scope of examination by defense counsel testing Teague's investigatory methods.

*Judgment affirmed.*